In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1840

DAWN HANSON, *et al.*,

*Plaintiffs-Appellees*,

*v.*

CHRIS LEVAN,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15-cv-5354 — **Robert M. Dow, Jr.**, *Judge*.

ARGUED MAY 28, 2020 — DECIDED JULY 21, 2020

Before MANION, KANNE, and WOOD, *Circuit Judges*.

KANNE, *Circuit Judge*. For some government jobs, political affiliation is an appropriate position requirement. But that's generally not the case. And unless political affiliation *is* an appropriate job requirement, the First Amendment forbids government officials from discharging employees based on their political affiliation. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (citing *Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980)).

After stepping into his elected office as Milton Township Assessor, Chris LeVan dismissed a group of employees who were Deputy Assessors, allegedly because they supported his political rival and predecessor. The fired deputies sued LeVan, claiming the terminations violated their First Amendment rights. In a motion to dismiss for failure to state a claim, LeVan asserted a qualified-immunity defense. The district court concluded that LeVan is not entitled to qualified immunity at this pleading stage, and LeVan appealed.

We affirm because, taking as true the plaintiffs' well-pleaded allegations about the characteristics of the Deputy Assessor position, a reasonable actor in LeVan's position would have known that dismissing the deputies based on their political affiliation violated their constitutional rights.

## I. BACKGROUND

According to the plaintiffs' complaint, in 2013 Chris LeVan was elected to the office of Milton Township Assessor, displacing his predecessor and political rival, Bob Earl. Shortly after he took office, LeVan discharged a group of employees—Deputy Assessors[1]—who had publicly supported Earl in his run for reelection.

The dismissed employees sued LeVan in his personal and official capacities for discharging them on improper bases. At issue now are the plaintiffs' challenges that LeVan, under color of state law, violated their rights guaranteed by the First Amendment (applicable to Illinois through the Fourteenth Amendment) by firing them because of their political

---

[1] Among the plaintiffs dismissed from their positions in the Assessor's Office is a former IT Administrator. This appeal does not concern that plaintiff, only those who were Deputy Assessors.

affiliation. *See* 42 U.S.C. § 1983. They alleged that the Deputy Assessor position is not one for which political affiliation is a valid job requirement, as the position did not authorize the employees to have meaningful input in policy decisions, yet LeVan discharged them based on their political affiliation.

For these challenges against LeVan in his individual capacity, LeVan asserted qualified immunity as a defense. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993) (recognizing that qualified immunity is afforded only to individual officials, not to units of government); *Ruffino v. Sheahan*, 218 F.3d 697, 700 (7th Cir. 2000). He did so in a motion to dismiss, under Rule 12(b)(6), for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The district court concluded that LeVan is not entitled to qualified immunity at the pleading stage and allowed the claims to proceed. LeVan sought interlocutory review of that decision.

## II. ANALYSIS

### A. Appellate Jurisdiction

The first order of business is our jurisdiction to review the district court's qualified-immunity decision. The former Deputy Assessors contend that we lack jurisdiction, reasoning that the district court's order is nonfinal and falls outside the collateral-order doctrine. We disagree.

Appellate courts' jurisdiction under 28 U.S.C. § 1291 is indeed limited to appeals from "final decisions" of district courts. But some "final decisions" are made before the district court enters a final judgment: certain "collateral orders" are immediately reviewable because they "'[1] conclusively determine the disputed question, [2] resolve an important issue

completely separate from the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment.'" *Johnson v. Jones*, 515 U.S. 304, 310 (1995) (bracketed numbers in original) (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993)).

Denials of qualified immunity often fall into this category of immediately appealable orders. They are reviewable when "the issue appealed concerned, not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of 'clearly established' law." *Id.* at 311 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985)); *see, e.g., Leiser v. Kloth*, 933 F.3d 696, 700–01 (7th Cir. 2019), *cert. denied*, No. 19-7508 (Apr. 27, 2020). In other words, the denial of qualified immunity is within our jurisdiction to review before a final judgment if that denial turns on "abstract" questions of law. *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009) (quoting *Johnson*, 515 U.S. at 317). By contrast, interlocutory review is unavailable for a district court's "fact-based" decision—for example, that the evidence in the pretrial record shows a genuine issue of fact on which qualified immunity depends. *Id.* (quoting *Johnson*, 515 U.S. at 317); *see Johnson*, 515 U.S. at 307, 313 (no appellate jurisdiction to review district court's order determining that evidence is sufficient to permit a particular finding of fact after trial).

The district court's decision here was on a motion to dismiss, under Rule 12(b)(6), for failure to state a claim. As we see it, LeVan essentially contended that the plaintiffs did not assert a constitutional violation upon which relief can be granted because LeVan is qualifiedly immune. Fed. R. Civ. P. 12(b)(6); *see Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000).

We have accepted that dismissal under Rule 12(b)(6) can preserve an official's right, under qualified-immunity doctrine, "not to stand trial or face the other burdens of litigation," including pretrial discovery. *Mitchell*, 472 U.S. at 526; *see Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009); *Reed v. Palmer*, 906 F.3d 540, 548–49 (7th Cir. 2018). But dismissal under Rule 12(b)(6) is not the only way to preserve that right. *See Jacobs*, 215 F.3d at 774–75 (Easterbrook, J., concurring in part and in the judgment) (identifying other means by which immunity may be decided without protracted discovery). Nor is it always (if ever) the most suitable procedural setting to determine whether an official is qualifiedly immune, because immunity may depend on particular facts that a plaintiff need not plead to state a claim. *Alvarado v. Litscher*, 267 F.3d 648, 651–52 (7th Cir. 2001).

Ultimately, dismissal under Rule 12(b)(6) is appropriate based on qualified immunity only when the plaintiffs' well-pleaded allegations, taken as true, do not "state a claim of violation of clearly established law." *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996) (quoting *Mitchell*, 472 U.S. at 526). We elaborate and apply this standard later on, but for now it is enough to reiterate that "a complaint may be dismissed under Rule 12(b)(6) on qualified immunity grounds where the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred." *Jacobs*, 215 F.3d at 765 n.3. And the familiar plausibility standard governs.[2] *See Reed*, 906 F.3d at 548.

---

[2] We have recognized the tension between the plausibility standard that applies to motions for dismissal of a complaint; the often fact-intensive nature of qualified-immunity determinations; and the protection that the qualified-immunity doctrine provides against the burdens of pretrial

The district court concluded that the plaintiffs stated a claim for a violation of a clearly established right, barring qualified immunity at this point in the litigation. The court reached this conclusion by taking the plaintiffs' well-pleaded allegations as true and answering two questions: First, did the plaintiffs' allegations add up to a claim that a constitutional right was violated? And second, was the right clearly established when LeVan discharged the employees? As far as jurisdiction is concerned, these are "abstract" legal questions about "the substance and clarity of pre-existing law," given the facts as alleged. *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011); *cf. Leiser*, 933 F.3d at 700–01.

The plaintiffs argue that the first question is fact-based, nonfinal, and thus unreviewable. They point to the district court's remark that whether LeVan will be entitled to qualified immunity on a further-developed record "cannot be resolved on the pleadings." This remark, they reason, indicates that the district court's decision both (a) turns on facts not yet determined and (b) is not necessarily the last qualified-immunity determination the court will make.

---

matters, including discovery. *See, e.g., Reed*, 906 F.3d at 548–49; *Jacobs*, 215 F.3d at 765 n.3. Although this tension generally makes Rule 12(b)(6) a poor fit for dismissal on the basis of qualified immunity, *Reed*, 906 F.3d at 548–49; *see also Siefert v. Hamilton County*, 951 F.3d 753, 761 (6th Cir. 2020), it does not preclude appellate jurisdiction, *see Iqbal*, 556 U.S. at 672; *Behrens*, 516 U.S. at 307–08; *see, e.g., Hardeman v. Curran*, 933 F.3d 816, 819–20 (7th Cir. 2019). The tension is also eased by other rules, like Rule 12(e) and Rule 26(c), that can be engaged to avoid or curtail discovery before a qualified-immunity decision is made on summary judgment. *See Crawford-El v. Britton*, 523 U.S. 574, 598–99 (1998); *Jacobs*, 215 F.3d at 775 (Easterbrook, J., concurring in part and in the judgment).

The merits inquiry embedded in the first question—
whether political affiliation is an appropriate requirement for
a certain position—certainly calls for a case-specific assess-
ment of the government job at hand. *See Branti*, 445 U.S. at 518.
And it is true that we have generally classified this inquiry as
a matter of fact that in some cases ought to be resolved as a
matter of law[3]—depending on how clearly statutes, ordi-
nances, regulations, and a reliable job description establish
the position responsibilities.[4]

---

[3] Whether this inquiry is a matter of law or fact split the circuits. *See Horton v. Taylor*, 767 F.2d 471, 478 (8th Cir. 1985). *Compare Gordon v. County of Rockland*, 110 F.3d 886, 888–89, 889 n.4 (2d Cir. 1997) (concluding that the propriety of political affiliation as a criterion for a position is a matter of law, and suggesting it is never an issue for the jury to decide), *with Pleva v. Norquist*, 195 F.3d 905, 912 (7th Cir. 1999) (stating that the issue "should ordinarily be left for a jury to determine" but may be resolved as a matter of law when the position responsibilities are clearly outlined by law).

[4] *See, e.g., Allman v. Smith*, 790 F.3d 762, 766–67 (7th Cir. 2015) (ac-knowledging that trial could show plaintiff had more discretion than job description implied); *Powers v. Richards*, 549 F.3d 505, 510 (7th Cir. 2008) (resolving inquiry as a matter of law when plaintiff did not dispute that the official job description accurately explained the position responsibili-ties); *Fuerst v. Clarke*, 454 F.3d 770, 773–74 (7th Cir. 2006) (concluding that the matter could not be resolved on summary judgment); *Riley v. Blago-jevich*, 425 F.3d 357, 360–61 (7th Cir. 2005) (contemplating that a systemat-ically unreliable job description could precipitate a factual inquiry, but quoting *Danahy v. Buscaglia*, 134 F.3d 1185, 1191 (2d Cir. 1998), for asser-tion that the inquiry "presents a question of law informed solely by the job description and the powers of office"); *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 972 (7th Cir. 2001) (observing that "an individual's status as a policy-making employee frequently poses a fact question" but that "a court may resolve this issue without the aid of a finder of fact" when "the duties and responsibilities of a particular position are clearly defined by law and regulations"); *Pleva*, 195 F.3d at 912 (citing cases); *Selch*

But we have treated the issue as an "abstract" matter of law, for purposes of jurisdiction, when antecedent facts are taken as given and we are asked to review only the application of a legal standard to those given facts in a qualified-immunity assessment. *See Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018); *see, e.g.*, *Moss v. Martin*, 473 F.3d 694, 702 (7th Cir. 2007); *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 355–56 (7th Cir. 2005); *see also Danahy v. Buscaglia*, 134 F.3d 1185, 1190–91 (2d Cir. 1998) ("For the purposes of jurisdiction, … we assume the truth of the plaintiffs' claims that they were subjected to patronage dismissals and that they were not policymakers."); *cf. Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1067 (2020) ("questions of law," for purposes of appellate jurisdiction under 8 U.S.C. § 1252(a)(2)(D), "includes the application of a legal standard to undisputed or established facts").

That is the situation we face here. The court did not evaluate evidence or make any "antecedent" determinations that we are asked to review. *Allman v. Smith*, 790 F.3d 762, 764 (7th Cir. 2015); *see, e.g.*, *Jackson*, 888 F.3d at 263–64 (unreviewable antecedent question lay in whether the district court properly decided not to watch a video that, defendants argued, contradicted plaintiff's factual allegations).

The district court's remark—that whether LeVan will be entitled to qualified immunity on a further-developed record "cannot be resolved on the pleadings"—merely acknowledges the different standards that apply to a Rule 12(b)(6) motion to dismiss and a Rule 56(a) motion for summary

---

*v. Letts*, 5 F.3d 1040, 1044 (7th Cir. 1993) (reviewing determination for clear error). We do not reconsider our precedent today to address whether it would be more appropriate to characterize the inquiry as a "mixed question of law and fact." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020).

judgment. As we've already mentioned, before discovery be-gins, a defendant asserting qualified immunity is entitled to dismissal if the allegations in the complaint fail to state a claim of a clearly established right having been violated. *Mitchell*, 472 U.S. at 526. After discovery, however, the defendant as-serting qualified immunity is entitled to summary judgment if the evidence fails to demonstrate a genuine factual issue about the characteristics of the employee's position or whether the defendant committed the alleged acts. *See id.*; *All-man*, 790 F.3d at 766–67.

In this way, while qualified immunity may not entitle a defendant to dismissal on the pleadings, qualified immunity may entitle the defendant to summary judgment later on. And because each determination is conclusive as to the de-fendant's right to avoid the burdens of pretrial discovery and trial, a denial of qualified immunity can be a "final decision" at both stages of the litigation. *See Behrens*, 516 U.S. at 307–08.

Having confirmed that we have jurisdiction to review the court's qualified-immunity decision, we next address whether the court properly concluded that LeVan is not enti-tled to qualified immunity at this pleading stage.

*B.  Qualified Immunity*

LeVan is entitled to dismissal unless (1) the plaintiffs ade-quately alleged facts that, if true, would constitute a violation of a statutory or constitutional right, and (2) the right was "clearly established" at the time of the alleged violation, such that a reasonable public official would have known his con-duct was unlawful. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Moss*, 473 F.3d at 702. We review *de novo* whether each criterion has been met, accepting all well-pleaded factual

allegations as true and drawing all permissible inferences in the plaintiffs' favor. *See Reed*, 906 F.3d at 546, 549; *Chasensky v. Walker*, 740 F.3d 1088, 1093, 1095 (7th Cir. 2014).

### 1. *Violation of a Right*

The plaintiffs alleged in their complaint that the Deputy Assessor position is not one for which political affiliation is a valid requirement and that LeVan dismissed the plaintiffs because of their political affiliation, in violation of their First Amendment rights. LeVan counters that political affiliation is an appropriate job requirement for the Deputy Assessor position, so the employees' dismissal based on political patronage is not a First Amendment violation.

The general rule, under the Supreme Court's decisions in *Elrod* and *Branti*, is that dismissal of a public employee on the basis of political affiliation violates the employee's First Amendment rights. *See Rutan*, 497 U.S. at 64; *Bogart v. Vermilion County*, 909 F.3d 210, 213 (7th Cir. 2018). The exception is when party affiliation is an appropriate requirement for the position involved. *See Hagan v. Quinn*, 867 F.3d 816, 824 (7th Cir. 2017). This so-called *Elrod-Branti* or "policymaking"[5] exception derives from the principles of representative government: without political alignment in certain positions, employees occupying those positions could obstruct the implementation of policies presumably sanctioned by the

---

[5] The exception's application does not turn on whether the position can bear the label "policymaker," *see Branti*, 445 U.S. at 518, but we have used the term "policymaker" as a shorthand for the broad category of offices that fall within the *Elrod-Branti* exception. *See Hagan*, 867 F.3d at 824; *Kiddy-Brown*, 408 F.3d at 355.

electorate, who placed the current administration in power. *Elrod*, 427 U.S. at 367; *Bogart*, 909 F.3d at 213.

As a result, the *Elrod-Branti* exception applies if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. We have held that political affiliation is an appropriate requirement when "the [employee's] position authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Kiddy-Brown*, 408 F.3d at 355 (quoting *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981)). This assessment includes whether the position "entails the exercise of a substantial amount of *political* (as distinct from professional) discretion," *Powers v. Richards*, 549 F.3d 505, 510 (7th Cir. 2008), and whether the position gives its holder access to the superior's "confidential, politically sensitive thoughts," *Bogart*, 909 F.3d at 213 (quoting *Riley v. Blagojevich*, 425 F.3d 357, 359 (7th Cir. 2005)).

Our focus, when determining whether a position falls within the *Elrod-Branti* exception, is on "the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Tomczak v. City of Chicago*, 765 F.2d 633, 640 (7th Cir. 1985); *see Embry v. City of Calumet*, 701 F.3d 231, 236 (7th Cir. 2012). We have thus endorsed courts' use of reliable job descriptions, which—if objective—provide "a provisional safe harbor for elected officials" who may depend on the descriptions when deciding whom to replace on political grounds. *Riley*, 425 F.3d at 365. But a statute or ordinance trumps a job description whenever they conflict. *See Davis v. Ockomon*, 668 F.3d 473, 478 (7th Cir. 2012). And at

this 12(b)(6) stage, we don't have an official description of the Deputy Assessor position, *cf. Hagan*, 867 F.3d at 827; we have only the plaintiffs' allegations and the Illinois Tax Code, which LeVan says confirms the Deputy Assessor position is one for which political alliance is a valid requirement.

Before we turn to the statutes, it's important to address the role that the plaintiffs' allegations play in our analysis. LeVan argues that the plaintiffs' allegations about their job duties should not be considered because the issue turns on the *inherent* powers of an office, not a particular occupant's functions.

It is true that whether political affiliation is a valid job requirement depends on the *position itself*—that is, the functions that "usually attend" the position—rather than specific acts performed by a particular position holder. *Tomczak*, 765 F.2d at 640–41. This is why statutes, ordinances, regulations, and reliable job descriptions are the go-to sources for determining what the position entails. *See Davis*, 668 F.3d at 478. But the plaintiffs' allegations about the nature of the position may be relevant, too. If the statutes, ordinances, regulations, and job description do not provide a clear enough picture of the position, or if the job description provides sufficient detail but is inaccurate or unreliable, then how the position is treated and performed on the ground can supply the necessary information about the "normal duties," *Allman*, 790 F.3d at 766, or the functions that "usually attend [the] position," *Tomczak*, 765 F.2d at 641. *See Allen v. Martin*, 460 F.3d 939, 944 (7th Cir. 2006). Stated differently, facts about how the position is carried out can support inferences about the powers inherent in the office. Consequently, unless a statute, ordinance, regulation, or reliable job description confirms that the position falls within the *Elrod-Branti* exception, we take the plaintiffs'

plausible allegations to the contrary as true at the pleading stage. *See, e.g.*, *Moss*, 473 F.3d at 698–99, 702; *Kiddy-Brown*, 408 F.3d at 355–56.

The plaintiffs alleged in their complaint that political affiliation is not an appropriate requirement for the Deputy Assessor position. They elaborated that the Deputy Assessor position did not give the plaintiffs any policymaking authority, and that the Milton Township Assessor's Office employs Chief Deputy Assessors, who "advise the Assessor on policy issues"; fill the Assessor's role in the Assessor's absence; and manage the lower-level office personnel, including the Deputy Assessors. The lower-level Deputy Assessors, the plaintiffs alleged, are not authorized to perform any of these advisory or managerial functions.

The plaintiffs continued that their positions involved taking measurements of property and inputting those measurements, along with other collected data, into computer programs and formulas that were set by statutes, regulations, state-issued guidelines, and the County and Township Assessors. The Deputy Assessors had "no control or discretion" over the formulas or programs. And the Township Assessor—not the Deputy Assessors—was empowered to change an assessment. The Deputy Assessor positions also involved "other clerical functions."

The plaintiffs additionally rely on a declaration, attached to their complaint, by the prior Township Assessor, who stated that Chief Deputy Assessors, only, were in positions to advise the Assessor on policymaking issues and to fill the Assessor's role in his absence. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (observing that documents attached to

the complaint and on which the plaintiff relies to support a claim may be considered on a motion to dismiss).

Taken alone, the plaintiffs' allegations portray the Deputy Assessor position as one that does not involve meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation. The predetermined formulas and computer programs that the lower-level Deputy Assessors apply suggest that any discretion the position holds "is channeled by professional rather than political norms." *Riley*, 425 F.3d at 360.

The alleged office hierarchy also supports an inference that the lower-level Deputy Assessor position does not endow its holders with influence over policy choices or access to the Township Assessor's politically sensitive thoughts: only the Chief Deputy Assessors hold cabinet-like managerial and advisory roles; and the lower-level Deputy Assessor position does not carry power to alter an assessment resulting from the prescribed formulas or programs.

Thus, unless a law makes these allegations implausible, the plaintiffs have alleged that they held low-level positions lacking political discretion and for which political affiliation is not a valid requirement.

We've been alerted to statutes (no ordinances) that address the duties and responsibilities of the Township Assessor and deputies. The Illinois Tax Code provides that each year "the assessor, in person or by deputy, shall actually view and determine as near as practicable the value of each property listed for taxation … and assess the property at 33 ⅓ % of its fair cash value, or in accordance with … [certain statutes or county ordinances]." 35 ILCS 200/9-155. It also provides that

an assessor "may appoint one or more suitable persons as deputies to assist in making the assessment, and may appoint other employees required for operation of the office." 35 ILCS 200/2-65. Thus, the Township Assessor may carry out the statutorily imposed assessment duty with the help of appointed deputy assessors, who may "assist in making the assessment." *Id.* The Code also defines "assessor" as "county, township, multi-township or deputy assessors, all of whom evaluate and appraise property." 35 ILCS 200/1-10. LeVan says these statutes confirm the plaintiffs' positions fit the *Elrod-Branti* exception.

We can assume that the Township Assessor position falls within the *Elrod-Branti* exception; the plaintiffs even allege that LeVan made policy. So, if the statutes expressly confirmed that the Deputy Assessor position had all the same powers as the Township Assessor, we would have no trouble concluding that the plaintiffs' positions also fit within the *Elrod-Branti* exception. That was the case with the Indiana deputy county auditor position in *Kline v. Hughes*, 131 F.3d 708, 710 (7th Cir. 1997) (deputy who was vested with the power by express statute to perform all duties of the auditor fell within the *Elrod-Branti* exception).

But the Illinois Code does not declare that a deputy assessor has all the same authorizations and duties as the assessor. It instead specifies that the assessor may deputize employees "to assist in making the assessment" of properties—not to hold all the same power and responsibilities as the assessor or to take the assessor's place when the office becomes vacant. 35 ILCS 200/2-65.[6] The Code's definition of "assessor" as

---

[6] Deputy assessors are authorized to administer oaths. 35 ILCS 200/24-30. But we don't see how power to administer an oath equals meaningful

"county, township, multi-township or deputy assessors" does not make the Township Assessor position one and the same as the Deputy Assessor position. 35 ILCS 200/1-10. It merely recognizes that when "assessor" appears in the corresponding statutes, that term may refer to any of the listed positions.

This leaves us with the following critical question: Do Deputy Assessors have inherent authority to provide meaningful input into decisions on issues where there is room for principled disagreement on goals or their implementation because the Illinois Code permits deputies to help the Township Assessor make an assessment?

The statutes do not confirm an affirmative answer, as they do not establish the extent to which political discretion plays a part in the Deputy Assessor's role in "actually view[ing] and determin[ing] as near as practicable the value of each property listed for taxation … and assess[ing] the property at 33 ⅓ % of its fair cash value, or in accordance with [certain statutes or ordinances]." 35 ILCS 200/9-155. The Code defines "33 ⅓ %"[7] and "fair cash value."[8] And other statutes, ordinances, or "general rules" prescribed by the Department of

---

influence in policy decisions or access to politically sensitive deliberations; the power to administer an oath is not power to make hiring-and-firing or other placement decisions.

[7] "One-third of the fair cash value of property, as determined by the [State Revenue] Department's sales ratio studies for the 3 most recent years preceding the assessment year, adjusted to take into account any changes in assessment levels implemented since the data for the studies were collected." 35 ILCS 200/1-55.

[8] "The amount for which a property can be sold in the due course of business and trade, not under duress, between a willing buyer and a willing seller." 35 ILCS 200/1-50.

Revenue may leave the assessment task devoid of any policy-making discretion, even if it requires some professional discretion. *See* 35 ILCS 200/8-5(3); *see generally People ex rel. Cutmore v. Harding*, 164 N.E. 827, 829 (Ill. 1929) (holding that county deputy assessor was not entitled to the higher compensation authorized for a clerk, and noting that the deputy's role in determining property value includes some form of "discretion," without identifying that discretion as political or professional).

It may also be that any policy discretion and confidential deliberation that is left for the Assessor's Office is done by the Township Assessor and the Chief Deputy Assessors who act as advisors or "formulate[] plans for the implementation of broad goals," *Elrod*, 427 U.S. at 368. Those policies may then be inflexibly executed by the lower-level Deputy Assessors when they "assist in making the assessment." 35 ILCS 200/2-65. In other words, the Deputy Assessor's role in performing assessments may involve only professional discretion and mechanical application of formulas set by legislators, regulators, the Township Assessor, and the cabinet-like advisors who occupy the Chief Deputy Assessor position. Finally, although the assessment produced by a deputy may be deemed the Township Assessor's own, that does not determine whether the deputy exercises political discretion in performing the assessment.

So, no statutes or ordinances confirm whether the Deputy Assessor position involves policymaking input or access to the assessor's politically sensitive or confidential thoughts. And at this point, we have no job description, much less a reliable one. Thus, the plaintiffs' allegations about the Deputy Assessor position characteristics—specifically, that the

position lacks policymaking authority and access—are plausible. The plaintiffs also adequately alleged that LeVan dismissed the Deputy Assessors on political-patronage grounds, so the plaintiffs stated a claim of violated First Amendment rights under *Elrod* and *Branti*.

### 2. Clear Establishment of the Right

Having concluded that the plaintiffs adequately pled a violation of a right, we move to the question whether the contours of the allegedly violated right were, at the time LeVan dismissed the plaintiffs, "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (quoting *Gustafson v. Adkins*, 803 F.3d 883, 891 (7th Cir. 2015)).

Critically, we approach this question by taking the plaintiffs' well-pleaded allegations as true. We assume at this 12(b)(6) stage that the plaintiffs occupied positions lacking authority to have meaningful input into policy decisions and to access politically sensitive or confidential deliberations. We also take as given that the employees were fired based on their political affiliation. *See Moss*, 473 F.3d at 702; *Kiddy-Brown*, 408 F.3d at 356. Consequently, the more specific question we face is this: When LeVan fired the plaintiffs, would every reasonable state actor in his shoes have understood that dismissing an employee from a position lacking meaningful input into political decisionmaking violates the employee's First Amendment rights?

LeVan says this question assumes too much, arguing that the nature of the Deputy Assessor position—that is, whether

it falls inside or outside the *Elrod-Branti* exception—was not beyond debate.

But because we are at the 12(b)(6) stage, the plaintiffs receive the benefit of all plausible allegations and reasonable inferences being treated as true. This makes the set of contextual facts that are assumed for purposes of this qualified-immunity inquiry broad: the assumed context includes that the Deputy Assessor position is not a cabinet-like role but rather a lower-level position involving no political discretion in performing assessments (that is, collecting data and plugging it into prescribed formulas and computer programs). Faced with this set of circumstances, a reasonable officer in LeVan's position would have known that firing the non-policymaking employees on political-patronage grounds violates their First Amendments rights.

As we mentioned earlier, qualified immunity warrants dismissal at the 12(b)(6) stage only when "the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred." *Jacobs*, 215 F.3d at 765 n.3. The right that the plaintiffs allege LeVan violated has long been established in our circuit. We observed in *Kiddy-Brown* that "by 2003, it was well-established that the First Amendment prohibits a state official from dismissing, on political grounds, an employee who was not charged with policymaking duties." *Kiddy-Brown*, 408 F.3d at 357. And we reiterated this conclusion again in *Moss*, in 2007. *See* 473 F.3d at 702; *see also Allman*, 790 F.3d at 767 (observing that our cases had clearly established that a person who has limited operational discretion but no significant policymaking discretion cannot be fired on political grounds). That right did not become unclear between those decisions and the

plaintiffs' dismissals in 2014, so our precedent "placed the statutory or constitutional question beyond debate." *Gustafson*, 803 F.3d at 891 (quoting *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013)).

LeVan's disagreement with the assumed context here illustrates the mismatch between the 12(b)(6) plausibility standard and the often fact-intensive nature of qualified-immunity inquiries. *See supra*, at n.2; *Reed*, 906 F.3d at 548–49; *Jacobs*, 215 F.3d at 765 n.3. But that incongruity does not justify heightening the pleading standard, which imposes on the plaintiffs no obligation to initially "anticipate and overcome a defense of qualified immunity" in their complaint. *Jacobs*, 215 F.3d at 765 n.3. *See generally Leatherman*, 507 U.S. at 168 (no particularity requirement or heightened standard for claims under § 1983); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("[T]wo—and only two—allegations are required in order to state a cause of action under [§ 1983]. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law.").

The plausibility standard, which leads us to take as given the plaintiffs' allegations about the nature of their positions, is why "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Alvarado*, 267 F.3d at 651. And it is why the plaintiffs' First Amendment claims should not be dismissed on qualified-immunity grounds here.

We are not persuaded by LeVan's additional argument for why the constitutional question—whether dismissing the Deputy Assessors on political-patronage grounds violated their First Amendment rights—was not beyond debate. He

points out that the district judge originally assigned to this case, Judge Samuel Der-Yeghiayan, concluded that the position fell within the *Elrod-Branti* exception as a matter of law, and when the case was reassigned to Judge Robert Dow upon Judge Der-Yeghiayan's retirement, Judge Dow decided otherwise on reconsideration.

LeVan is correct that political-patronage dismissals overall comprise a "somewhat murky area of the law," *Moss v. Martin*, 614 F.3d 707, 712 (7th Cir. 2010), and that the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from on different point by Pearson*, 555 U.S. at 236).

But LeVan did not face "an undeveloped state of the law" regarding political-patronage dismissals. *Wilson v. Layne*, 526 U.S. 603, 617 (1999). Nor did he align his conduct with court holdings that the Milton Township Deputy Assessor position falls within the *Elrod-Branti* exception. *Cf. Pearson*, 555 U.S. at 244–45 (officers reasonably believed their conduct was lawful when a doctrine under which their conduct would be lawful had been accepted by the two State Supreme Courts and all three Federal Courts of Appeals that considered it, with no court of appeals having issued a contrary decision). No case "directly on point" was required for the relevant right to have been clearly established. *Kiddy-Brown*, 408 F.3d at 356 (quoting *Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996)).

The context LeVan faced was whether to fire, on political-patronage grounds, low-level employees (as opposed to cabinet-level advisors) who performed clerical and professional work involving no political discretion. And when LeVan

dismissed the plaintiffs, the law was clear that a position lacking the features of a policymaking role—such as significant political discretion or cabinet-level advisory functions—falls under the *Elrod-Branti* rule, not the exception. *See Allman*, 790 F.3d at 767; *Moss*, 473 F.3d at 702; *Kiddy-Brown*, 408 F.3d at 356–57.

We thus think it "sufficiently clear" that—taking as given the plaintiffs' well-pleaded allegations that the positions occupied a low rung of the bureaucratic latter and lacked policymaking authority—every reasonable official would have understood that firing the plaintiffs because of their political affiliation violates their First Amendment rights. *Kemp*, 877 F.3d at 351 (quoting *Gustafson*, 803 F.3d at 891).

To be clear, LeVan may be entitled to qualified immunity on a motion for summary judgment, at which time the plaintiffs' well-pleaded allegations are not taken as true. But that is a matter different from the one before us now. *See Behrens*, 516 U.S. at 308.

### III. CONCLUSION

Because we have jurisdiction to review the district court's qualified-immunity decision, and because the court correctly concluded that LeVan is not entitled to qualified immunity at this stage in the litigation, we AFFIRM.